IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STANFORD CLACKS,

                Plaintiff,

v.

KWIK TRIP, INC.,

                Defendant.

OPINION and ORDER

21-cv-611-jdp

---

Plaintiff Stanford Clacks worked as a truck driver for defendant Kwik Trip, Inc., which owns and operates a chain of convenience stores. Clacks, who is Black, endured racial harassment on the job, particularly during his training period. In this suit, Clacks asserts three claims against Kwik Trip: (1) he was subjected to a hostile work environment; (2) he was passed over for a promotion in favor of white drivers; and (3) Kwik Trip terminated him in retaliation for complaining about the harassment.

Kwik Trip moves for summary judgment. Dkt. 42. The court will grant the motion. Clacks has not established a basis to hold Kwik Trip liable for the hostile work environment. Clacks experienced severe racist harassment from some of his co-workers. But when Clacks informed Kwik Trip about the harassment, Kwik Trip took prompt action to investigate Clacks's complaints and ultimately fired the employees who harassed him. Clacks's failure to promote claim fails because it is undisputed that Clacks did not meet the minimum qualifications for the position he sought. As for the retaliation claim, it is undisputed that Kwik Trip offered Clacks the opportunity to return to his position and that Clacks did not accept that offer. No reasonable jury could conclude that Kwik Trip fired Clacks to retaliate against him.

UNDISPUTED FACTS

A. **Evidentiary issues**

The court begins with three issues about the admissibility of Clacks's evidence. Clacks opposes Kwik Trip's motion for summary judgment primarily on the basis of his own declaration. Dkt. 56. A declaration is admissible summary judgment evidence—even if it is uncorroborated and self-serving—so long as it is based on the declarant's personal knowledge. *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). But Kwik Trip identifies three problems with Clacks's declaration.

First, some of Clacks's statements are not based on his personal knowledge. For example, Clacks alleges that he applied to two petroleum driver positions that ultimately went to white drivers with less truck driving experience. Dkt. 56, ¶¶ 15–16. But Clacks does not explain how he knows that the drivers were white or had less experience. In his deposition, Clacks testified that he did not know who Kwik Trip hired for the positions. Dkt. 52 (Clacks Dep. at 160:16–20). Clacks also states that he was given broken equipment more often than white drivers, but he does not explain how he knows that other drivers experienced mechanical issues less frequently. *See Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814 (7th Cir. 2022) (employees' subjective belief that they had to do harder jobs than white employees insufficient to show race-based harassment). The court will disregard the statements in Clacks's declaration for which he does not explain how he has personal knowledge.

Second, some of Clacks's assertions contradict his deposition testimony. Clacks states in his declaration that during his training period, he made multiple reports to his supervisor, Sean Clements, that two of his trainers were making racist comments about him. Specifically, he avers that he made at least three complaints about his first trainer, Tom Roerkohl, *see*

2

Dkt. 56, at ¶¶ 4–6, and two complaints about his second trainer, Brett Nechkash, *see id.* at ¶¶ 17, 19. But in his deposition, Clacks identified only two complaints that he made to Clements, one for each trainer. *See* Dkt. 52 (Clacks Dep. at 57:17–22 (Roerkohl); 70:20–24 (Nechkash)). Clacks also testified that he did not tell Clements any details or specifics about the nature of Roerkohl's harassment, *id.* at 61:18–20, and that he complained only that Roerkohl was a bad trainer. Clacks also avers in his declaration that in response to his complaints about Nechkash, Clements told Clacks that there were no other trainers available and told Clacks to put up with the harassment for several more weeks. But Clacks previously testified that he told Clements about Nechkash only a day or two before the end of his training period and that Clements assigned Clacks a different trainer for his final day of training. *Id.* at 71:13–23; 72:5–7 ("Q. So once you reached out to [Clements], [Nechkash] was in the rearview mirror? A. At the time, yes.").

The sham-affidavit rule prevents a party from relying on a declaration that contradicts the party's prior deposition or other sworn testimony. *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). The rule is applied "to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 751 (7th Cir. 2010). Clacks does not explain the contradictions between his deposition testimony and his declaration, so the court will credit his deposition testimony and disregard his declaration on these topics.

Third, Clacks's declaration contains information that he did not produce in discovery. One of Kwik Trip's interrogatories directed Clacks to "[i]dentify any communications (either verbal or written)" with any of Kwik Trip's employees related to the allegations in the lawsuit. Dkt. 61-3, at 18. Clacks's response included only a few emails between Clacks and human

resources and otherwise directed Kwik Trip to "See Initial Disclosures." *Id.* Clacks's initial disclosures include only a list of witnesses and the general subject of their testimony. Kwik Trip contends that Clacks's declaration includes statements about communications with Kwik Trip employees that Clacks did not disclose, the most important being a meeting where Clacks aired his concerns about racism in the workplace with another supervisor, Jeremy Renner.

If a party fails to provide information in disclosures, discovery responses, or supplementation of discovery, that party may not use that that information as evidence on a motion, or at a hearing or trial, unless the court finds grounds to excuse the failure. Fed. R. Civ. P. 37(c)(1). But a party may still use that evidence if it has been made known to the other party during the discovery process or in writing. Rule 26(e)(1)(A); *Gutierrez v. AT&T Broadband, LLC*, 382 F.3d 725, 733 (7th Cir. 2004). Clacks discussed the meeting with the other drivers and Renner in his deposition. Dkt. 52 (Clacks Dep. at 104:4–23). Thus, Kwik Trip had a fair opportunity to seek discovery about the meeting from Renner and the other drivers who were present. *See Gutierrez*, 382 F.3d at 733 (plaintiffs knew of relevant witness because defendant's designated deponent discussed her in his deposition). So the court will not strike Clacks's statements about the meeting for his failure to disclose it in discovery.

With those preliminaries in mind, the following facts are undisputed except where noted.

**B. Background**

Defendant Kwik Trip owns and operates convenience stores throughout the Midwest. Plaintiff Stanford Clacks, a Black man, began working for Kwik Trip as a perishable food driver in June 2018. In that role, Clacks delivered food products to Kwik Trip locations in the Madison, Wisconsin area by truck.

**C. Alleged harassment during training**

As part of Clacks's training, he was assigned to shadow a rotation of experienced perishable food drivers to learn the duties of the position. Clacks had no issues with his first shadow assignment. The problems started with Clacks's second trainer, Tom Roerkohl. Roerkohl frequently called Clacks the n-word, told Clacks that he was a "dumb monkey," asked Clacks questions about the race of Clacks's wife, and told Clacks that he knew some people who were white supremacists, among other things.

Clacks complained about Roerkohl to his supervisor, Sean Clements. Clacks did not go into the specifics of the harassment, telling Clements only that Roerkohl was a bad trainer. Dkt. 52 (Clacks Dep. at 58:4–61:20). A day or two after Clacks complained to Clements, Clacks was assigned to a new trainer. Clacks worked with Roerkohl for less than two weeks. *Id.* at 55:8–16. Clacks did not see Roerkohl again after the end of the training period.

Clacks's next trainer was Brett Nechkash. Nechkash also frequently called Clacks the n-word. Clacks trained with Nechkash for about a month. Near the end of Clacks's rotation with Nechkash, Clacks complained about Nechkash to Clements. The nature of Clacks's complaints is genuinely disputed. Clacks testified that he told Clements that Nechkash called him the n-word; Clements avers in his declaration that Clacks never told him that any harassment was related to his race.

Clements gave Clacks another trainer for one final day of training. Clacks would continue to see Nechkash about once a week after training was over. *Id.* at 74:9–10. Nechkash would engage in "horseplay" and make jokes about subjects like "sex and drugs and guns" when he saw Clacks, but Nechkash did not use the n-word after Clacks's training period ended. *Id.* at 73:2–7.

5

**D. Alleged harassment after training**

Laren Kruse, a shuttle driver who drove truck drivers between their trucks and the distribution center, would often call Clacks the n-word when they saw each other.

At a driver's meeting in early 2019, Nechkash handed Clacks a note that read "youre [sic] the only one here leave." (Clacks does not know who wrote the note, but he now believes it was Nechkash himself.) Clacks thought that the note was based on his race because he was the only Black driver at the meeting. Clacks told his new supervisor, Jeremy Renner, about the note a few days later. Dkt. 52, at 96:12–25. Renner told Clacks that Nechkash was a "dickhead" but that the note was "just how guys like to joke around." *Id.* At 97:10–13.

A few months later, Clacks called a meeting with the Madison-based drivers and his supervisors to address his concerns. Renner was present at the meeting, along with about 10 other drivers. Clacks told the group that he was tired of the "racial name calling" and "horse playing." *Id.* at 104:4–13. Clacks testified that Renner broke down in tears and promised that he would do better in the future. The meeting led to "a lot of improvement" and Clacks enjoyed going to work after that point. *Id.* at 105:5–15.

Kwik Trip had two petroleum driver positions available in summer 2019. Petroleum drivers are responsible for delivering fuel to Kwik Trip locations, and they have the potential to earn more than perishable food drivers. The petroleum driver position requires a minimum of two years of truck driving experience, which Clacks did not have. Clacks applied for the petroleum driver position but did not get it. Clacks discussed the job with Mike Krajewski, Kwik Trip's perishable transportation director, who told Clacks that he did not have enough experience for the position.

In March 2020, Clacks asked to take pandemic leave to take care of his son, and Kwik Trip approved the request. Kwik Trip told its employees, including Clacks, that they were expected to return to work by July 31, 2020.

E. **Clacks complains to human resources**

In July 2020, Clacks sent an email to Kwik Trip's general Human Resources email address alleging that he had been subjected to race discrimination during his employment. Clacks stated that he felt the need to reach out now "due to the current pandemic and race war against black people." Dkt. 52-3. Ashley Callaway, a human resources employee at Kwik Trip, reached out to Clacks for more information. Clacks told Callaway that during his training, Roerkohl called him the n-word and that Roerkohl identified himself as a white supremacist. Clacks refused to give any additional information about the alleged harassment, stating that he would only share additional details with perishable transportation director Mike Krajewski.

Clacks had a follow-up call with Krajewski and Callaway. Clacks repeated his allegations about Roerkohl's racist comments and told them that Nechkash would use the n-word toward him. Clacks also told them about the note he received at a drivers meeting that said "youre the only one here leave," and said that he received the note from a coworker named Jason. Dkt. 48-4, at 4.

A few days later, Clacks sent a letter to Kwik Trip that summarized his complaints. Clacks stated that (1) he had been called the n-word on multiple occasions; (2) he had been disrespected and threatened by coworkers and trainers because of his race; (3) he had received a note saying "you are the only one here you should leave"; (4) he had been involved in an accident but "was never advised or told to go to the hospital right after the accident"; and (5) he had been denied unemployment benefits while on pandemic leave. Dkt. 54-2, at 2–3.

7

Kwik Trip retained an outside investigator, Mindy Rowland, to look into Clacks's allegations. Over the course of two interviews, Clacks told Rowland about the racist comments made by Roerkohl, Nechkash, and Kruse. Clacks also repeated his allegation that a coworker named Jason handed him a note that said "youre the only one here leave" in a driver meeting. Clacks told Rowland that he never found out who wrote the note and couldn't guess who it might have been. Dkt. 49, at 7.

Kwik Trip pushed back Clacks's July 31 return-to-work date until the investigation was completed. The investigation was completed in early August. Rowland ultimately concluded that many of Clacks's allegations about Roerkohl, Nechkash, and Kruse were likely true. Rowland also determined that Clacks was telling the truth about the note he received in a driver's meeting, but she concluded that she did not "have an ability to investigate [the] issue further." *Id.* Kwik Trip fired Kruse, Nechkash, and Roerkohl following the investigation.

Callaway and Krajewski called Clacks to tell him that Kruse, Nechkash, and Roerkohl had been fired and to discuss Clacks's return to work. Kwik Trip offered Clacks to return to his role as a perishable food driver. Dkt. 48-11, at 2 (Callaway call notes). In response, Clacks stated that he did not feel safe and feared that one of the fired employees could kill him. *See id.*; Dkt. 52 (Clacks Dep. at 148:25–149:3). Callaway said that if Clacks was uncomfortable returning to his perishable food driver role, they could talk about other positions such as a petroleum driver or a retail job. But Callaway noted that a retail job would pay less than his current position.

The parties dispute what happened next. Clacks testified in his deposition that he told Callaway and Krajewski that he could be interested in one of the other positions and that they should send him more information about them. Dkt. 52 (Clacks Dep. at 145:17–21). Callaway

8

wrote in her call notes that Clacks stated that he would not return to Kwik Trip in any position. Dkt. 48-11, at 2. (The call notes state that the call was recorded, *see id.*, but neither side adduced the recording.) In any event, Clacks and Callaway turned to discussing whether Clacks would accept a severance. *Id.* The parties did not reach an agreement over the phone.

Neither side provides a clear account of what happened after the call. Clacks testified that Kwik Trip did not provide Clacks with any additional information about the positions they discussed. Instead, it presented Clacks with a severance offer and declined to negotiate further. *See* Dkt. 52 (Clacks Dep. at 147:1–12). Clacks did not return to work at Kwik Trip in any capacity.

The court will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Clacks brings claims under 42 U.S.C. § 1981 for racial discrimination, alleging that Kwik Trip: (1) subjected him to a hostile work environment; (2) did not consider him for a petroleum driver position; and (3) terminated him in retaliation for making a complaint to human resources. Courts analyze § 1981 discrimination claims using the same framework as claims brought under Title VII of the Civil Rights Act, so the court will rely on authorities interpreting and applying both statues. *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011); *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012) ("The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981.").

As the moving party, Kwik Trip is entitled to summary judgment if it shows that there are no genuine disputes of material fact and is entitled to judgment as a matter of law. *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court views the evidence in the light most favorable to Clacks and draws all reasonable inferences in his favor. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). But in response to a motion for summary judgment, Clacks has the burden to adduce evidence that would allow a reasonable jury to find in his favor on his claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## A. Hostile work environment

Actionable discrimination under Title VII or § 1981 includes "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To prove a claim for hostile work environment based on race, an employee must show that: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813-14 (7th Cir. 2022). It is undisputed that Clacks was subjected to unwelcome harassment. But Kwik Trip contends that Clacks has not met his burden on the other three elements.

As for the second and third elements, a reasonable jury could conclude that Clacks was subjected to harassment based on his race and that it was severe or pervasive. In determining whether harassment is severe or pervasive, the court must consider (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim. *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013). Here, Clacks has evidence that he experienced offensive, threatening, and humiliating conduct from

two of his trainers, Roerkohl and Nechkash. Both trainers frequently called Clacks the n-word during Clacks's training period. The n-word is not just a racial slur; it may be unique in its ability to offend, provoke, and injure. *See Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 477 (7th Cir. 2004). ("Given American history, we recognize that the word . . . can have a highly disturbing impact on the listener.") Depending on the circumstances, use of the n-word alone can be severe and humiliating. *Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 641 (7th Cir. 2019). Roerkohl went even further by calling Clacks a monkey and asking inappropriate questions about the race of Clacks's wife. Roerkohl also told Clacks that he knew several people who were white supremacists, which Clacks reasonably interpreted as a veiled threat. These comments were clearly motivated by Clacks's race. And although Clacks was in training for a relatively short time, he states that his trainers made racist remarks almost constantly during that period.

Clacks experienced less intense harassment after the training period, but it continued. Kruse, the shuttle driver, continued to use the n-word around Clack when they saw each other. But Clacks testified that he "didn't have a huge issue with [Kruse]," Dkt. 52 (Clacks Dep. at 80:1) so perhaps Kruse's harassing conduct was not so severe or pervasive that it altered the terms of Clacks's employment. Clacks also received a note from another driver that "youre the only one here leave." It is reasonable to infer that the note was based on Clacks's race because he was the only Black driver in the room. But the note does not expressly threaten Clacks and it does not include explicitly racist language, so the note in isolation would not be sufficient to support a hostile work environment claim. Clacks has not adduced evidence that the other alleged harassment he received, such as being assigned broken equipment or not being told to go to the hospital after his accident, was related to his race. But even without any evidence of post-training harassment, a reasonable jury could conclude that Clacks was subjected to a

11

hostile work environment based on the severe, race-based harassment that he received during his training period. So Clacks has made an adequate showing on the first three elements.

Clacks's claim falters on the fourth element, employer liability. Courts evaluate the basis for employer liability differently depending on whether the alleged harassment was perpetrated by supervisors or coworkers. When the harassing employee is a supervisor, the employer is strictly liable if the harassment culminates in a tangible employment action. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). But when the harassing employee is the victim's co-worker, the employer is liable only if "it failed to take appropriate remedial measures once apprised of the harassment." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 809 (7th Cir. 2000).

Clacks does not contend that any of his harassers were "supervisors," as that term is used in discrimination cases. An employee is a supervisor only if he or she is empowered to take tangible employment actions against the victim. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. Clacks asserts in his proposed findings of fact that he needed Roerkohl's approval to move from the trainee position to a full driver position, but he cites no evidence to support that assertion. *See* Dkt. 54, ¶ 4. And Kwik Trip adduced a declaration from Krajewski that the decision to move Clacks out of training was made by the final senior trainer in the rotation, not by Roerkohl or Nechkash. Dkt. 60, ¶ 3. So Clacks has failed to adduce evidence that he was harassed by a supervisor.[1]

---

[1] In his declaration, Clacks states that he received a text message from Jeremy Renner, one of Clacks's supervisors, stating "Your pull-out game is weak" in June 2020, apparently in reference to the fact that Clacks had four children. Dkt. 56, ¶ 30. But Clacks does not discuss this text message in his proposed findings of fact or in his brief, and he makes no argument that the text

Because Clacks was not harassed by a supervisor, he must show that Kwik Trip knew, or should have known, that Clacks was experiencing severe or pervasive harassment and yet failed to take reasonable measures to rectify the problem. *See Bombaci v. Journal Cmty. Publ'g Grp., Inc.*, 482 F.3d 979, 985 n.2 (7th Cir. 2007); *Episcopo v. GMC*, 128 F. App'x 519, 523 (7th Cir. 2005) ("the employer will not be on notice unless the plaintiff finds some way to communicate facts that would support a claim of a hostile work environment."). An employer may have constructive notice of harassment if the harassment was obvious. *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1046 (7th Cir. 2000). Otherwise, the law does not consider an employer to be apprised of the harassment "unless the employee makes a concerted effort to inform the employer that a problem exists." *Silk v. City of Chicago*, 194 F.3d 788, 807 (7th Cir. 1999) (internal quotation omitted).

Clacks has not shown that the harassment was so obvious that Kwik Trip had constructive knowledge of it. He adduces no evidence that Nechkash, Roerkohl, or Kruse harassed him in the presence of a supervisor or other employees. *Cf. Wilson v. Chrysler Corp.*, 172 F.3d 500, 509 (7th Cir. 1999) (finding constructive notice where harassment was "public and deliberately exhibitionist"). Although Roerkohl, Nechkash, and Kruse used the n-word frequently when they were around Clacks, the record does not suggest that the harassment was public or obvious in a way that Kwik Trip would be aware of the harassment unless Clacks complained about it.

Clacks concedes, implicitly at least, that Kwik Trip responded adequately to his July 2020 email detailing the harassment he had received over the course of his employment. But

---

message provides a basis for employer liability on his race-based hostile work environment claim. Clacks has forfeited any argument related to the text message.

Clacks contends that Kwik Trip is liable for a hostile environment before that because it failed to address his prior complaints of harassment. But Clacks has not shown that Kwik Trip responded inappropriately to any complaints that would have put Kwik Trip on notice that he was experiencing a hostile work environment. The court will examine each of Clacks's three complaints before July 2020 and Kwik Trip's responses.

1. **Complaints to Clements**

Clacks says that he told his supervisor, Sean Clements, about racist harassment that he received from Roerkohl and Nechkash. Kwik Trip's antidiscrimination policy directs employees to report harassment to an immediate supervisor, among other parties, (Dkt. 52-2, at 2), so Clements was a proper recipient for Clacks's complaints. But Clacks's complaints to Clements do not provide a basis for employer liability. As for the complaints about Roerkohl, Clacks testified in his deposition that he did not tell Clements that Roerkohl had harassed him because of his race. To establish liability under § 1981, an employee's complaints must put the company on notice that the harassment is based on the plaintiff's race. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426-27 (7th Cir. 2004). Clacks's complaints that Roerkohl was a bad trainer would not have alerted Clements that Roerkohl was harassing Clacks on the basis of Clacks's race. *See id.* (no liability where employee "did not report that she believed [co-worker conflicts] to be racially or sexually motivated.").

As for Clacks's complaints about Nechkash, whether Clacks told Clements that Nechkash had called him the n-word is genuinely disputed. But that dispute is immaterial. Even if the court credits Clacks's testimony, the record shows that Clacks did not complain about Nechkash until the end of his training rotation and that Clements responded to Clacks's complaints by assigning Clacks to a new trainer. Dkt. 52 (Clacks Dep. at 71:13–23). An

14

employer's response is adequate if it is reasonably likely to prevent harassment from reoccurring. *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1031 (7th Cir. 2004). Creating physical separation and minimizing time worked together are steps reasonably likely to end future harassment, depending on the circumstances. *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 995 (7th Cir. 2011). After Clacks's training period was over, Clacks continued to see Nechkash occasionally at the distribution center. But Clements was not required to eliminate all contact between Clacks and Nechkash. *See id.* (appropriate to "limit overlap" between harasser's and victim's work schedules as part of response); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 806, 813 (7th Cir. 2001) (reasonable to rearrange schedules so harasser and victim would work approximately one and a half hours together each day). Assigning Clacks a different trainer would ensure that Clacks and Nechkash were no longer spending time alone together in a truck, and thus that step was reasonably likely to end Nechkash's harassment.

**2. Complaint about the note**

Nechkash gave Clacks a note that said "youre the only one here leave" in a driver's meeting in early 2019. Clacks testified that he told Jeremy Renner, Kwik Trip's perishable transportation manager, about the note a few days after the meeting. In response, Renner told Clacks that Nechkash was just being a "dickhead" and joking around. It does not appear that Renner took any further action on the note.

Clacks's complaint about the note did not give rise to employer liability because it did not inform Kwik Trip that Clacks was subjected to severe or pervasive harassment based on his race. Clacks did not tell Renner that he thought the note was based on his race. Dkt. 52 (Clacks Dep. at 96:21–97:4). But even assuming that Renner should have known that the note was racially motivated, Clacks's complaint would not alert Renner to a hostile work environment.

15

The note does not expressly threaten Clacks and it does not use racist language, such as the n-word. An employee complaint about non-severe harassment does not establish employer liability for other, more severe harassment that the employer does not know about. *See Bombaci*, 482 F.3d at 985 n.2; *McPherson v. City of Waukegan*, 379 F.3d 430, 441 (7th Cir. 2004); *Episcopo*, 128 F. App'x at 523 (complaining about "one isolated incident" does not put a company on notice of a hostile work environment). Even if Clacks subjectively believed that the note was a racial threat, he did not communicate that belief to Renner. And without more knowledge about Clacks's history with Nechkash, Clacks's complaint would not have alerted Renner that the note was part of a larger campaign or pattern of racist harassment. Under those circumstances, Clacks's complaint about the note did not inform Kwik Trip that he was experiencing a hostile work environment, so it does not provide a basis for holding Kwik Trip liable for that hostile environment.

### 3. Complaints at driver's meeting

Clacks testified that in summer 2019, he called a meeting with several Madison-area drivers to discuss his experiences with racism in the workplace. Renner was present at the meeting. The parties dispute what Clacks said at the meeting. Clacks testified that he was tired of the racial name calling and "horseplay" and wanted drivers to cut it out. Renner stated in a declaration that Clacks never told him that he was experiencing race-based discrimination. Dkt. 46, ¶ 4. But that dispute is immaterial because Clacks does not explain why Renner's response was inadequate. Clacks testified that at the meeting Renner cried and stated that he would do better in the future, and the other drivers agreed to do the same. In Clacks's words, "[i]t was like a family affair" and "we got over our differences and we [were] able to move on." Dkt. 52 (Clacks Dep. at 104:21–25). And Clacks testified that things *did* improve after the

meeting, and that work was "like a great family" after that point. *Id.* at 105:7–12. Clacks makes no argument that Renner should have done more to address his complaints, so Clacks's complaints at the meeting cannot provide a basis for employer liability.

Clacks has not adduced evidence that would establish a basis to hold Kwik Trip liable for the racial harassment he experienced, so Kwik Trip is entitled to summary judgment on Clacks's hostile work environment claim.

**B. Failure to promote claim**

Clacks alleges that Kwik Trip discriminated against him by failing to promote him to a petroleum driver position in summer 2019. To survive Kwik Trip's motion for summary judgment, Clacks must adduce evidence from which a reasonable jury could conclude that Clacks's race was part of the reason he was not promoted. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

The parties agree that Clacks attempts to make his case using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Within this framework, if Clacks can adduce evidence to support a prima facie case of discrimination, the burden shifts to Kwik Trip to provide a nondiscriminatory reason for the decision. *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 891–92 (7th Cir. 2016). To make a prima facie case for failure to promote, a plaintiff must adduce evidence that: (1) he was a member of a protected class; (2) he was qualified for the position sought; (3) he was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position. *Id.* Summary judgment for the employer is appropriate if the employee fails to adduce evidence on any of the elements of a prima facie case. *Id.*

Clacks has not adduced evidence that he was qualified for the petroleum driver position or that Kwik Trip hired a person who was not Black for the position. The petroleum driver position required a minimum of two years of truck driving experience; Clacks did not have that much experience at the time he applied. Clacks also contended that the jobs went to white drivers with less experience, but the court cannot credit his declaration on that point because he does not explain how he has personal knowledge of who Kwik Trip ultimately hired. Because Clacks has not adduced admissible evidence to prove elements two and four of his prima facie case, his failure to promote claim fails.

**C.  Retaliation claim**

Clacks contends that Kwik Trip retaliated against him by effectively terminating him after he complained to human resources in July 2020. To defeat summary judgment on his retaliation claim under § 1981, Clacks must offer evidence from which a reasonable jury could find that: (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022). "Ultimately, the inquiry comes down to one question: Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the materially adverse action?" *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (internal quotation marks omitted). Kwik Trip does not dispute that Clacks's complaint to human resources is protected activity, but it contends that Clacks did not suffer an adverse employment action or that any employment action was caused by his complaints.

Clacks contends that Kwik Trip retaliated against him by "suspending" him during the investigation into his complaints, offering him positions that would pay less than his previous

18

job, and by never "giv[ing] a return date for his regular job or any details of any other positions" that he discussed with Callaway and Krajewski. Dkt. 55, at 8 (Clacks's brief).

Clacks's claim fails for one key reason: Callaway offered Clacks his old job and Clacks did not accept that offer. Clacks does not dispute that Callaway offered Clacks the opportunity to return to work as a perishable food driver, nor does he dispute that he refused the offer, although he says he refused because he was afraid that he would be harmed by one of the employees following the investigation. Despite Clacks's explanation, no reasonable jury could conclude that Kwik Trip prevented Clacks from returning to work or that it tried to demote him.

Clacks also argues that the offer to return to work was not genuine because Kwik Trip never gave him a return date. But Kwik Trip cannot be faulted for failing to give him a return date after Clacks expressly stated that he was not interested in the position. Clacks testified that he did not mean to imply on the call that he would never return to his job and that Callaway misunderstood him. Dkt. 55 (Clacks Dep. at 149:4–9). But it was reasonable for Callaway to conclude that Clacks was turning down their offer by stating that he was too afraid to return to work. After Clacks indicated that he would be uncomfortable returning to his perishable food driver position, Callaway brought up other jobs, including the petroleum driver position that Clacks had applied for a year prior. Even if the court credits Clacks's testimony about what was said during the call, no reasonable jury could infer that Kwik Trip intended to retaliate against Clacks in light of the offer to let him return to his job and Callaway's effort to explore alternative positions.

Because the court is granting summary judgment on the merits of Clacks's claims, the court need not consider Kwik Trip's argument that Clacks failed to mitigate his damages.

19

ORDER

IT IS ORDERED that defendant Kwik Trip, Inc.'s motion for summary judgment, Dkt. 42, is GRANTED. The clerk of court is directed to enter judgment for defendant and close the case.

Entered April 26, 2023.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge